FARMERS' MFG. CO. v. SPRUKS MFG. CO. et al.

(Circuit Court of Appeals, Fourth Circuit. February 2, 1904.)

No. 493.

1. PATENTS—ANTICIPATION—PATENT FOR INEFFECTIVE DEVICE.
    A patent for a device which fails to accomplish the desired end is not an anticipation of one for a device which successfully accomplishes it.
2. SAME—VENTILATING BARRELS.
    The East patent, No. 429,021, for a ventilating barrel, made of a sheet of veneer, the essential feature of which is the making of parallel slits in the veneer lengthwise of the barrel, and terminating at a distance from the ends, leaving the edges of the sheets integral, which at the same time enables the barrel to be given the proper curvature throughout its length, and affords ventilation, was not anticipated by anything in the prior art, and, in view of the fact that the barrel of the patent met instant recognition on account of its superior utility and cheapness, and at once went into extensive use, must be conceded patentable invention. Claims 1 and 3 also *held* infringed.

Appeal from the Circuit Court of the United States for the Eastern District of North Carolina, at Newbern.

For opinion below, see 119 Fed. 594.

E. T. Fenwick and H. H. Bliss, for appellant.

Hector T. Fenton and W. B. Rodman, for appellees.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge. This suit was brought by the Farmers' Manufacturing Company, assignee of John F. East, against the

¶ 1. See Patents, vol. 38, Cent. Dig. § 73.

Spruks Manufacturing Company and others, to enjoin the infringement of letters patent No. 429,021, dated May 27, 1890, for an improvement in barrels. The court below decided that the East patent was invalid, in that it did not involve anything more than ordinary mechanical skill, in view of the extensive prior art knowledge; and, second, that there was no infringement of the East patent by defendants.

The East patent contains four clauses of claim. The proofs and argument relate to an allegation of infringement of claims 1 and 3, only, which are as follows:

"(1) A barrel or receptacle having its sides composed of a sheet of veneer provided with parallel slits arranged lengthwise of the barrel, and terminating at a distance from the edges of the sheet, and leaving the edges of the veneer sheet continuous or integral, as shown and described."

"(3) A barrel or receptacle having its sides composed of a sheet of veneer provided with parallel slits arranged lengthwise of the barrel, and terminating at a distance from the edges of the sheet, and expanded in the middle to a greater diameter than at the ends, substantially as shown and described."

In his statement of invention, East says:

"I am aware that it is not new to make barrels of veneer, and that the ends of a veneer barrel have been drawn together by first slitting the edges of the veneer blank in order to get the bilge or curve to the barrel, and I do not claim any such construction."

His invention, as stated by him—

"Consists of a barrel composed of a veneer blank cut through its middle with a series of parallel slits extending transversely to the blank and longitudinally to the barrel, but not out to either edge of the blank, thus leaving the edges of the blank, which form the chines of the barrel, continuous or unsevered, while the middle cut portion is extended to get the bilge or curve to the barrel, and also to form ventilating openings."

The first patent for a barrel made of veneer was issued to Sheridan Roberts, May 14, 1861, and reissued as No. 6,044, September 8, 1874; and the opinion of the court below, so far as it adjudges East's patent invalid, seems to hinge upon that. That invention relates to the formation of the body of the barrel in volute sheets cut or removed from the surface of solid cylinders, and forming the bulge of the barrel by forming notches or slots from the edges toward the center, or cutting out or removing gores or wedge-shaped pieces from each edge, so that, by bringing these cut surfaces into contact by means of hooping the body of the barrel, the barrel thus formed will have the desired bulge. An examination of this patent discloses that its design was to form a tight barrel, and a barrel shape, as contradistinguished from a mere cylinder, was obtained by cutting out gores or wedge-shaped pieces at the ends; and, by drawing in the veneer sheet at the joined ends, the gore spaces would be closed up. The vice of Roberts' patent was that it did not have that peculiar curvature at its sides, continuous from top to bottom and at every vertical line, which for ages has been known to be necessary for giving the greatest strength. It is this arch shape throughout, at every vertical line of its sides from top to bottom, that distinguishes a barrel from a cylinder. Roberts' patent would produce a package with a cylindrical central zone and two cone-like ends. What

he refers to in his statement of invention as producing the "desired bulge," by the drawing together of the ends from which wedge-shaped pieces had been cut, would not be that bilge with uniform curvature from top to bottom so essential to a barrel-shaped barrel. The compressing the ends of the cylinder could have no other effect than to produce the semblance of a bulge, in that it was wider at the center than at the ends. It could have no bulging form of any spheroidal sort, and must remain simply a cylinder in the center, with the weakness characteristic of mere cylinders—of collapsing under pressure. Roberts' so-called barrel, therefore, is nothing more than a cylinder with a wider diameter and with cone-shaped ends, and lacks the curve or true bilge at the central zone, so essential to the strength of a barrel. It is probably due to this essential vice that barrels made after Roberts' device never came to be commercially successful, although the testimony shows that prolonged and expensive efforts were made to manufacture on the Roberts plan. Patent was granted to him in 1861, and renewed in 1874. It had been before the public for 29 years when East's application was before the Patent Office, and must have been thoroughly known to the commissioner when East's application was considered, and had proved to be inoperative and worthless. Roberts' barrel was not, and was not intended to be, a ventilating barrel. Considering this patent as an alleged limiting or anticipating document, what would a person skilled in the art of barrel making produce from inspecting the drawings of the patent and following it? Nothing but a tight, unventilated barrel, with a cylindrical center and cones at the ends. For nearly 30 years it had been on the public record without producing any effect on the art or trade of barrel making. It cannot be said that a patent for a device which fails to accomplish the desired end is an anticipation of one which successfully accomplishes it.

The other patent referred to in the court below is that of Elijah B. Georgia, No. 164,542, dated June 15, 1875. This invention, as stated in the application—

"Relates to means whereby fruits may be packed, transported, and kept without deterioration for a considerable period. The invention consists in having the staves or heads or both sawed or incised longitudinally, or in the direction of the grain, so as to get the necessary aeration without weakening materially the stave."

It does not seem to us that this Georgia patent has any real pertinency to the matter involved in this controversy, as this barrel is essentially different in structure from that involved in the patent in suit. This is an ordinary stave barrel with apertures or ventilators. East does not pretend to have been the first to make ventilators in a stave barrel. The essence of his invention and the characteristic thing about it, was that for the first time a ventilated barrel was made of veneer, and the central, outward, bulging bend at the central zone was secured by means of precisely arranged incisions or indentations in the veneer sheet, which thus relieved the fibers at the middle of the strain.

Certain other patents were offered in evidence, such as the fruit basket of Cook, No. 24,723; the cherry box of Mabbett, No. 73,352, and the wooden mat of Bailey, No. 417,215. They require little notice, as it is not contended that East is the first to have devised ventilating

receptacles for fruit, or the first to have invented the use of veneer for the making of such packages.

The need of a ventilated barrel for the shipment of vegetables had been greatly felt along the whole South Atlantic Coast by those engaged in truck farming, and, previous to East's invention, secondhand flour barrels, with holes chopped by hand, were commonly used for this purpose. These were found to be inconvenient, expensive, and sometimes unsanitary; and the testimony shows that, after East's invention, barrels were made of veneer from a gum tree which grows abundantly in that region, and put upon the market at a cost of about one-half of the old barrels, and that about a million of such barrels are now being annually made and sold for the shipment of potatoes alone, and that, except the recently produced barrel of the defendant, there is no other ventilated veneer barrel used in that region but that manufactured by the complainant company or its licensees; and there is also testimony that parties interested in the defendant company, including Mr. Canfield, its general manager, importuned the complainants for the right to manufacture their barrels, but were refused because they had already granted a license for the territory which he was endeavoring to secure. The testimony is abundant that the East barrel had gone into general use, that the public had attested its superior utility and value by adopting the same, and that it had superseded all other barrels previously used for like purposes. The fact that prior devices, such as the Roberts and the Georgia barrel, had not been successful, and that the East barrel secured general acceptance and extensive use, and was a commercial success, creates a strong and almost conclusive presumption that the East barrel was the product of invention and had patentable merit, and that something more than mere application of mechanical skill was involved in its production. It is difficult to draw the line between mechanical skill and patentable invention, and now that East has succeeded in producing a barrel of great commercial use, out of simple and inexpensive material, by what seems to be but a trivial modification of previously known devices, it is easy to say that any mechanic skilled in the art, having before him the previous invention of Roberts, could readily have accomplished the same object by ordinary mechanical skill, but the fact remains that, notwithstanding the great demand and imperative need of the very thing that East produced, no other mechanic or barrel maker had ever produced such a barrel previous to East's patent. Simple as the device is, others failed to see it, or to estimate its value, or to bring it to the public notice. Ventilated barrels were known and used long before, but these were barrels made of staves, and ventilating holes were cut with hatchets or by mechanical means, such as are set forth in the Georgia patent. So, too, barrels made of veneer could be made in accordance with the Roberts patent, which would produce a tight, unventilated barrel, with cones at the ends, and a cylindrical center. The opinion of the learned judge below states the difference between the Roberts barrel and East's in these words:

"Avoiding the Roberts method of making a bilge barrel by contracting the chine ends, he did three things which differentiate his method and the product

of it—three steps which are sequential—the order of which is essential, and all so dependent on each other, that none may be omitted without destroying, or at least failing to obtain, the resultant finished product, the ventilating bilge barrel of veneer described in the patent."

It is precisely this process of differentiation that lies at the basis of East's patent, and the invention consists in arranging incisions or indentations at the central zone of the veneer sheet, whereby is produced not only ventilated openings at the center, but also, and that which seems more important, by thus relieving the fibers at the middle of the strain, the barrel is capable of being expanded in the middle so as to produce the true bilge at the center, and secure the true barrel shape, in lieu of the cylindrical shape of the Roberts barrel. That is the essence of the East patent, and therein, it seems to us, was displayed the true inventive faculty. It was this last step which has turned previous failures into a success, and we are therefore of opinion that the East patent is valid.

The next question is whether the defendant company has infringed this patent. The defendant's barrel is made in accordance with the patent barrel roll for shaping veneering for truck barrels made by G. D. Canfield, inventor, February 1, 1901. As stated by the court below:

"This barrel is made from a sheet of veneer. The latter is cut to form two barrels; the central, dividing line showing the lines of cutting the sheet into two parts, from each of which two barrels are made. The blank for each barrel is a flat sheet, having at each end a series of gores between the end hoops, and the center bilge a series of parallel cuts partially through the wood."

And, as further stated, ventilation is supplied in the defendant's barrel, "near the head or chine ends, rather than altogether in the central portion of the barrel." There is much testimony tending to show that the defendant's barrel is superior to the East barrel; that the ventilation near the chine ends, by openings cut through, is more perfect than in the East barrel; and this is probably true, for it appears that the ventilation in the central portion of defendant's barrel is very slight, as compared with that secured by the slots cut in the outer portion of the barrel; but it would be none the less an infringement, if the defendant, by additional efforts, has produced a better barrel, provided that in the process of making the improved barrel the defendant used any part of that device or method for which East's patent was granted; and it seems clear to us that, in the process of manufacturing its barrel, the defendant has adopted East's invention of cutting through the middle a series of parallel slits extending transversely to the blank and longitudinally to the barrel, and not out to either edge of the blank. It is precisely these longitudinal parallel slits in the center of the barrel that is the essence of East's invention, for it is this that differentiates East's barrel from the Roberts barrel, with its smooth, continuous, uncut, imperforate central zone, which had proved to be impracticable and useless. Without these longitudinal incisions, the arch shape which distinguishes a barrel from a cylinder could not be attained; and that these slits are made for this very purpose is proved by Canfield himself, the general manager of the defendant company. He says:

"The slits marked B on the defendant's veneer sheet are for the purpose of giving the barrel a uniform bilge or curve."

And again, on page 130, he says:

"As has been stated in my previous testimony, the slits are put in there [referring to the defendant's barrel] for the purpose of giving the barrel an even curve from the top to the bottom of the barrel."

And although it is plain that the defendants do not rely upon these central incisions for the purpose of giving ventilation to their barrel, they do rely upon the characteristic part of East's patent, and upon the device employed by him for the first time, and for which his patent was granted; that is, the longitudinal slits in the central zone, which allow the fibers to bilge out uniformly, and provides that strong, arch-like support necessary to true barrels, and without which the Roberts' patent—the barrel with the solid center—had proved to be an inoperative and worthless article.

It is true that East has not discovered any new elementary material for the making of barrels, and the elementary principle upon which barrels are constructed is old; but he has adopted a new form, and discovered a new combination, a diversity of method and diversity of effect, a new modus operandi, whereby it has been practically demonstrated that cheaper and better results are obtained, which benefit the world; and therefore, under the principles and precedents, he has become entitled to that protection which the patent laws are intended to secure for "any new and useful improvement on any art, machine, manufacture, or composition of matter." Such combination, however simple and obvious, if entirely new, is patentable, and not the less so because up to a certain point he uses old methods and old materials. Having produced a new and better result by his invention, the law looks to that, and "it is of no consequence," says Justice Story, "whether the thing be simple or complicated, whether it be by accident, or by long, laborious thought, or by an instantaneous flash of the mind, that it was first done."

The expert witness for the defendant appellee admits, "I do not find all of the individual elements [of the East barrel] in any one of the patents noted." A casual inspection of all of the patents introduced in behalf of the defendant below makes it clear that the essential feature of East's invention, to wit, the longitudinal incisions at the circumference, which secured the bilge or true barrel shape, as well as the ventilating apertures, were not in any of them, or suggested by any of them.

In the case of the Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154, the Supreme Court of the United States, in reviewing the state of the art, says:

"It is true that the affixing of barbs to a fence wire does not apparently give a wide scope to the ingenuity of the inventor; but, from the crude device of Hunt to the perfected wire of Glidden, each patent has marked a step in the progress in the art. The difference between the Kelly fence and the Glidden fence is not a radical one; but, slight as it may seem to be, it was apparently this which made the barbed wire fence a practical and commercial success. * * * Under such circumstances, courts have not been reluctant to sustain the patent to the man who has taken the final step which has turned a failure into a success. In the law of patents, it is the last step that wins. It may be strange that, considering the important results obtained by Kelly in his patent, it did not occur to him to substitute a coiled wire in place of the wire-shaped prong, but evidently it did not; and to the man to whom it did ought not to

be denied the quality of inventor. There are many instances in the reported decisions in this court where the monopoly has been sustained in favor of the last of a series of inventors, all of whom were groping to attain a certain result, which only the last one of the number seemed able to grasp. Conspicuous among these is the case of Loom Company v. Higgins, 105 U. S. 580, 591 [26 L. Ed. 1177], where an improvement in looms for weaving pile fabrics, consisting of such a new combination of known devices as to give to a loom the capacity of weaving 50 yards of carpet a day when before it could only weave 40, was held to be patentable. It was said by the court, in answer to the argument that the combination was a mere aggregation of old and well-known devices, that 'this argument would be sound if the combination claimed by Webster was an obvious one for attaining the advantages proposed—one which would occur to any mechanic skilled in the art. But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not for years occur in this light to even the most skillful persons. It may have been under their very eyes. They may almost be said to have stumbled over it, but they certainly failed to see it, to estimate its value, and to bring it into notice. * * * Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though, perhaps, not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.' So, in Consolidated Valve Company v. Crosby Valve Company, 113 U. S. 157, 179 [5 Sup. Ct. 513, 525, 28 L. Ed. 939], it was said 'that Richardson's invention brought to success what prior inventors had essayed and partly accomplished. He used some things which had been used before, but he added just that which was necessary to make the whole a practically valuable and economical apparatus. The fact that the known valves were not used, and the speedy and extensive adoption of Richardson's valve, are facts in harmony with the evidence that his valve contains just what the prior valves lack, and go to support the conclusion at which we have arrived on the question of novelty.' In Smith v. Goodyear Dental Vulcanite Company, 93 U. S. 486–495 [23 L. Ed. 952], it was said by the court, 'We do not say that the single fact that a device has grown into general use, and has displaced other devices which had previously been employed for analogous uses, establishes in all cases that the later device involves a patentable invention. It may, however, always be considered; and, when the other facts in the case leave the question in doubt, it is sufficient to turn the scale.' "

In Keystone Manufacturing Company v. Adams, 151 U. S. 144, 14 Sup. Ct. 297, 38 L. Ed. 103, the court says:

"Where a patentable invention consists of an improvement of a machine previously existing, it is not always easy to point out what it is that distinguishes a new and successful machine from an old and ineffectual one; but when, in a class of machines so widely used as this in question, it is made to appear at last, after repeated and futile attempts, a machine has been contrived which accomplishes the result desired, and when the Patent Office has granted a patent to the successful inventor, the court should not be ready to adopt a narrow or astute construction fatal to the grant."

In Smith v. Goodyear Dental Vulcanite Company, 93 U. S. 498, 23 L. Ed. 952, the court says:

"The patent itself is prima facie evidence that the patentee was the first inventor. At least, it casts upon him who denies it the burden of sustaining his denial by proof. We do not find such proof in the case."

In Topliff v. Topliff et al., 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, the court says:

"It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted nor actually used, for the performance of such function."

The simplicity and apparently obvious nature of East's device seem to be the chief argument against its patentability, but the books are full of cases where patents have been sustained for changes in methods which seem equally simple. The substitution of the hot blast for the cold in making iron; the use of a flame of gas to finish cloth, rather than the flame of oil; the substitution of pit coal for charcoal, and of anthracite coal for bituminous coal, in certain processes—are some of them.

This court has very recently, in Crown Cork & Seal Company v. Aluminum Stopper Company, 108 Fed. 845, 48 C. C. A. 72, been called upon to review that phase of the question wherein elements, none of which were new, were so co-ordinated as to produce a new and successful result, and its conclusions need not be repeated.

While the question of patentable novelty in East's device might not be entirely free from doubt, the grant of a patent by the Patent Office creates a presumption in its favor, which those who contest it must rebut by proofs; and when the proofs show, as they do, that there was a wide and general demand for a new and cheaper barrel, that none of the alleged anticipatory devices had filled that want, and that East's barrel met instant public recognition, general acceptance, and extensive use, superseding all other devices, the presumption of novelty seems irresistible; and our conclusion is that the patent should be upheld, and the defendants enjoined from infringing it by the making of the longitudinal slits in the central zone, which the testimony clearly shows that they do. In so far as it is claimed that they have improved upon East's invention, in providing additional ventilating apertures, this opinion, of course, does not affect such alleged improvement.

The decree of the Circuit Court will therefore be reversed, and the case remanded for further proceedings in conformity with this opinion. Reversed.